UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
APRIL CODY,

                                    Plaintiffs,             MEMORANDUM
                                                           OPINION AND ORDER

                  -against-                                CV 05-2334 (ETB)

COUNTY OF NASSAU, NEW YORK and
NASSAU COMMUNITY COLLEGE,

                                    Defendants.
------------------------------------------------------------------------X

        Plaintiff, April Cody ("Cody" or "plaintiff"), brings this employment discrimination

action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.

§ 2000e et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the

New York Executive Law §§ 296 and 297, alleging discrimination and retaliation on the basis of

a disability.  Before the Court is the motion of the defendants, County of Nassau (the "County")

and Nassau Community College ("NCC"), for summary judgment.  For the following reasons,

the defendants' motion is granted in its entirety.


                                    BACKGROUND

        Plaintiff commenced her employment with Nassau Community College on March 22,

1985 as a "Computer Operator I."  (Def. R. 56.1 Stmt. ("Def. R. 56.1") ¶ 1; Pl. R. 56.1 Stmt.

("Pl. R. 56.1") ¶ 1.)  As such, plaintiff was a member of the Civil Service Employees

Association ("CSEA") and was required to be physically examined by a Civil Service

Commission physician.  (Def. R. 56.1 ¶¶ 2-3; Pl. R. 56.1 ¶¶ 2-3.)  During her physical

examination, plaintiff advised the doctor that, although she suffered from osteoarthritis since junior high school, she did not foresee any limitations on her ability to perform her job responsibilities as a Computer Operator at NCC.  (Dep. of April Cody, dated Aug. 18, 2006 ("Cody Dep."), 41-42.)

Plaintiff's supervisor upon her employment with NCC was John Carey ("Carey"), who reported to Dennis Gai ("Gai"), the Director of Management Information Systems.  (Def. R. 56.1 ¶¶ 5-6; Pl. R. 56.1 ¶¶ 5-6.)  As a Computer Operator I, plaintiff's employment duties required her to "run jobs" for other departments on campus, including printing labels, letters, transcripts and forms.  (Def. R. 56.1 ¶ 17; Pl. R. 56.1 ¶ 17; Cody Dep. 9-10.)  The labels that plaintiff used for printing came in boxes weighing approximately two to three pounds while letterhead was packaged in boxes weighing approximately fifteen or twenty pounds.  (Def. R. 56.1 ¶ 7; Pl. R. 56.1 ¶ 7; Cody Dep. 11-12.)

In 1985, when plaintiff commenced her employment with NCC, the Computer Center in which she worked was located on the ground floor of Building B.  (Def. R. 56.1 ¶ 9; Pl. R. 56.1 ¶ 9.)  Plaintiff's employment shift at that time was from 7:30 a.m. to 3:15 p.m., which was considered the day shift.  (Def. R. 56.1 ¶ 10; Pl. R. 56.1 ¶ 10.)  Gai considered plaintiff's job performance while employed as a Computer Operator I as "good."  (Dep. of Dennis Gai, dated July 27, 2006 ("Gai Dep."), 13-14.)

In or about 1987, while employed at NCC, plaintiff applied to the County for, and received, a handicapped parking permit because she had difficulties walking to the Computer Center from her designated parking area on the NCC campus.  (Cody Dep. 48-49, 51; Def. Ex. C.)  In support of her application, plaintiff provided the County with a letter from her physician,

Dr. Sheldon Blau, which stated that plaintiff suffers from osteoarthritis and, as a result, is "unable to walk distances." (Cody Dep. 49; Def. Ex. D.) Neither of plaintiff's supervisors at the time, Carey or Gai, had to approve plaintiff's application for a handicapped parking permit. (Cody Dep. 49.) Nor did Carey or Gai see the letter from Dr. Blau indicating that plaintiff suffers from osteoarthritis at that time. (Cody Dep. 50.) At no point during plaintiff's employment as a Computer Operator I was she unable to perform the essential physical functions of her job. (Cody Dep. 63.)

Approximately four or five years after she began her employment with NCC, plaintiff was promoted to a "Computer Operator II," after passing the civil service examination for such a position. (Def. R. 56.1 ¶ 11; Pl. R. 56.1 ¶ 11; Cody Dep. 14-15.) Plaintiff's duties as a Computer Operator II were largely similar to those that she performed as a Computer Operator I; however, plaintiff did begin to take on more responsibility in that she had "more interaction with the people that had charge of the [computer] system" such that when a problem occurred, plaintiff would work with them to "troubleshoot why the system was down." (Def. R. 56.1 ¶ 12; Pl. R. 56.1 ¶ 12; Cody Dep. 18.) Plaintiff's employment shift as a Computer Operator II remained the same as when she was a Computer Operator I - 7:30 a.m. to 3:15 p.m - and plaintiff again reported to John Carey. (Def. R. 56.1 ¶ 13; Pl. R. 56.1 ¶ 13; Cody Dep. 18.) Dennis Gai considered plaintiff's job performance as a Computer Operator II to be "okay." (Gai Dep. 17.) There were no "major issues" with plaintiff's job performance while employed as a Computer Operator I or II. (Id. at 18.)

During her employment at NCC, plaintiff complained of having to move and lift boxes of forms, labels and paper because of her osteoarthritis and requested to have supplies contained

within the Computer Center.[1]  (Def. R. 56.1 ¶ 17; Pl. R. 56.1 ¶ 17; Cody Dep. 70-71.)  In

response to plaintiff's request, a meeting was held with Dennis Gai and Frank Kanter ("Kanter"),

the Assistant to the Director of Human Resources at NCC, Fred Downs, to discuss how

plaintiff's request could be accommodated, as well as what reasonable accommodations could be

made for plaintiff, pursuant to the ADA.  (Def. R. 56.1 ¶ 19; Pl. R. 56.1 ¶ 19; Cody Dep. at 81-

82, 84, 89.)  At this meeting, plaintiff provided Gai with the letter from Dr. Blau, dated June 11,

1986, that plaintiff had submitted to the County in support of her request for a handicapped

parking permit.  (Def. R. 56.1 ¶ 20; Pl. R. 56.1 ¶ 20; Cody Dep. 84-85, 87.)  The letter stated that

plaintiff was being treated for osteoarthritis and as a result of her condition, she was "unable to

walk distances."  (Def. Ex. D.)  The letter from Dr. Blau did not indicate the extent of plaintiff's

disability.  (Cody Dep. 86.)  This was the only documentation regarding her disability that

plaintiff provided to NCC at that time.  (Id. at 87.)

          In response to plaintiff's request, Gai suggested that she be given an equipment rolling

cart that she could stock with the paper and supplies needed and then push throughout the

building.  (Id.)  Plaintiff rejected this suggestion on the ground that she would be unable to push

the cart due to her osteoarthritis.  (Id.)  No other reasonable accommodations were offered to

plaintiff at that time.  (Id.)  However, the meeting concluded with an agreement that plaintiff

would be contacted by a County physician for the purpose of an examination so that further

accommodations could then be discussed.  (Id. at 88.)

          By inter-departmental memorandum dated November 2, 1994, NCC notified the Civil

_____

          [1]  However, at her deposition, plaintiff acknowledged that during her employment with
NCC, she had student aides who were available "most of the time" to assist her with "whatever
chores that needed to be done" in the Computer Center.  (Cody Dep. 21.)

Service Commission that plaintiff had approached Human Resources concerning her osteoarthritis and had requested that a reasonable accommodation be provided to her, pursuant to the ADA. (Def. Ex. E.) The inter-departmental memorandum stated that plaintiff was "requesting that her job be restructured in such a manner that it would not require the lifting or moving of large or heavy objects." (Id.) The memorandum noted that the 1986 letter plaintiff provided from Dr. Blau supported her claim of disability but that NCC "require[d] more detail and a more recent report as to [plaintiff's] condition." (Id.) Accordingly, NCC requested that plaintiff be scheduled for an appointment with a physician of the Civil Service Commission's choice for an evaluation. (Id.) Plaintiff received a copy of this memorandum and understood this request for an examination to be the same examination discussed at the meeting with Gai and Kanter. (Cody Dep. 89-90, 101.) By letter dated November 16, 1994, the Civil Service Commission requested that plaintiff submit her medical records to the Commission physician for purposes of evaluating plaintiff's request for an accommodation.[2] (Def. Ex. F.) No accommodation was ultimately provided to plaintiff, however, because she failed to submit the requested medical information. (Dep. of Fred Downs, dated July 27, 2006 ("Downs Dep."), 23-24.)

In early 1996, during the time that plaintiff was employed as a Computer Operator II, the Computer Center was moved from Building B to the basement or ground level of the NCC library. (Def. R. 56.1 ¶ 15; Pl. R. 56.1 ¶ 15; Cody Dep. 24, 72.) Shortly thereafter, in June 1996, plaintiff was promoted to a Computer Operator III. (Def. R. 56.1 ¶ 14; Pl. R. 56.1 ¶ 14; Cody

---

[2] There is a dispute between the parties as to whether plaintiff in fact received the November 16, 1994 letter from the Civil Service Commission.

Dep. 23.)  As a Computer Operator III, plaintiff was provided the opportunity to "schedule the jobs" and was given more responsibilities such as "verifying work, how to do so, [and] creating work."  (Cody Dep. 25.)  Plaintiff also "developed procedures for problems that would occur on the hardware and the software" and worked "very closely" with the programming staff "to get those procedures down for operations."  (Id.)  Plaintiff's supervisor as a Computer Operator III was Katherine Flick ("Flick").  (Cody Dep. 24-25.)  Plaintiff's employment shift as a Computer Operator III remained the same as it had previously been - 7:30 a.m. to 3:15 p.m.  (Cody Dep. 26.)  Plaintiff performed her duties as a Computer Operator III "fairly well."  (Gai Dep. 30.)

Between 1994 and July 2001, plaintiff was able to perform all of the job functions of a Computer Operator in the Computer Center.  (Def. R. 56.1 ¶ 22; Pl. R. 56.1 ¶ 22.)  In January 1998, however, plaintiff received a Notice of Personnel Action ("NOPA") for an incident that occurred on December 18, 1997, during which plaintiff refused to correct her time sheet, as requested, and used profanity toward her supervisor, Flick.  (Def. R. 56.1 ¶ 23; Pl. R. 56.1 ¶ 23; Def. Ex. G, S.)  The NOPA instructed that "[c]ontinuance of this behavior will result in disciplinary action."  (Def. Ex. G.)

In May 1998, plaintiff was transferred from NCC's Computer Center to its Help Desk, located in Building F.  (Def. R. 56.1 ¶ 24; Pl. R. 56.1 ¶ 24; Cody Dep. 128.)  Although plaintiff did not request this transfer, she had requested a transfer out of NCC to another County agency because she "was having too many difficulties at the college," particularly problems with her supervisor, Flick.  (Cody Dep. 132, 134, 143.)  Plaintiff made her request verbally to Dennis Gai but did not make a formal written request.  (Id. at 147-48.)  Within one year of her verbal request to Gai, plaintiff was transferred, within NCC, to the Help Desk.  (Id. at 153.)  Plaintiff's

reassignment to the Help Desk occurred as a result of her "severe personality conflict" with her supervisor, Flick. (Gai Dep. 31.)

While working at the Help Desk, plaintiff's supervisor was Harriet Goodman. (Cody Dep. 153.) Plaintiff's employment shift at the Help Desk was from 8:00 a.m. to 3:45 p.m. (Id. at 165.) Plaintiff stated at her deposition that during her employment at the Help Desk, she was only required to move or lift "heavy objects" on one occasion, which she described as "picking up diskettes" from the floor.[3] (Id. at 168-69.) Plaintiff 's employment at the Help Desk was considered a "desk job" in that it did not require "extensive bending or kneeling" or the lifting or moving of any "significant weight." (Id. at 169.) While employed at the Help Desk, plaintiff's osteoarthritis was "much more controllable" because of the decreased physical responsibilities of the position. (Id. at 171.) As a result, plaintiff did not feel it necessary to pursue any reasonable accommodations with regard to her job responsibilities or functions. (Id.) Plaintiff remained at the Help Desk until July 2001. (Id. at 181.)

<u>FACTS RELEVANT TO THE INSTANT ACTION</u>

In July 2001, plaintiff received an inter-departmental memorandum advising all NCC computer operators that a sudden change in personnel necessitated reassignment and possible shift changes for all computer operators for a period of several months. (Def. R. 56.1 ¶ 26; Pl. R. 56.1 ¶ 26; Def. Ex. H.) By memorandum dated July 6, 2001, Dennis Gai informed plaintiff that, as described in the previous inter-departmental memorandum, she was being reassigned from the

---

[3] The exact date of this incident is not discussed by either party; however, it would appear from the record that plaintiff was assigned to the Help Desk between May 1998 and July 2001.

Help Desk to the Computer Center.  (Def. Ex. I.)  The memorandum further advised plaintiff that her shift was being changed from the day shift to the night shift, which was from 5:45 p.m. to 1:30 a.m., and that her reassignment was effective as of August 6, 2001.  (Id.)  Gai's memorandum also stated that if "personnel actions [fell] into place quickly . . . [plaintiff's] assignment may be shorter" and that "if not . . . [the] assignment may be longer."  (Id.)  Plaintiff was chosen as the computer operator to be temporarily transferred to the night shift - over another computer operator, Richard Godek - due to plaintiff's inability to work with her former supervisor, Flick, who worked the day shift.  (Def. Ex. K (stating that plaintiff "was removed from the Computer Center because of her inability to work with Kathy Flick" and that "[t]o assign her back to the day shift in the Computer Center would have been [sic] recreated a bad situation that we had previously dealt with."))

In response to Gai's memo, plaintiff submitted a letter from her physician, Dr. Martin Lipschutz, dated July 16, 2001, which stated that he had been treating plaintiff for anxiety for the past year.  (Def. Ex. J.)  Dr. Lipschutz further stated that plaintiff was experiencing symptoms of generalized anxiety and panic attacks while at work.  (Id.)  Dr. Lipschutz advised Gai that he did not think that plaintiff would be "able to withstand a change in her work schedule" and that she would "function best on her current schedule" - the day shift.  (Id.)  Plaintiff accompanied the letter from Dr. Lipschutz with a letter of her own, addressed to Gai, which stated that she was "available to assist with the staffing problem in the Computer Center during [her] normal shift," the day shift.  (Pl. Ex. M.)  Gai forwarded these letters to Fred Downs, the Director of Human Resources at NCC, and the decision was made to let plaintiff's "assignment for the night shift as a temporary assignment stand the way it was."  (Gai Dep. 56-57.)

Plaintiff thereafter submitted a letter from another doctor, Dr. Gina DiGiovanna, dated August 7, 2001, which stated that due to her osteoarthritis, plaintiff is "unable to perform repetitive bending or climbing [and] was advised not to walk long distances." (Def. Ex. M.) Dr. DiGiovanna's letter further stated that plaintiff "noted increased symptoms [of her osteoarthritis] due to changes in temperature/humidity [and] should therefore avoid this." (Id.) Thereafter, by letter dated August 15, 2001 and addressed to Dennis Gai, plaintiff requested a reasonable accommodation, pursuant to the ADA. (Def. Ex. N.) Plaintiff's request stated that "[d]ue to the high level of air conditioning in the computer room . . . [she] was experiencing more than normal pain in [her] knees, making it difficult to perform the constant repetitive sitting/standing & lifting/carrying activities of the night shift." (Id.) Plaintiff further stated that "after being 'stalked' & harassed by a co-worker for the past four years," she was "extremely fearful for [her] safety having to work alone during the night in a building that offers questionable safety." [4] (Id.) Finally, plaintiff stated that it was also "difficult" for her to "coordinate [her] various doctor appointments while on a night shift." (Id.) Plaintiff requested that she be restored to her previous shift - the day shift - "for both health & safety reasons." (Id.)

Gai discussed plaintiff's letter with her and attempted to resolve the air conditioning issue by replacing the vented floor tiles underneath plaintiff's work station with solid floor tiles in an effort to prevent the air from directly flowing on plaintiff. (Gai Dep. 65-66; Def. Ex. O.) In addition, Gai requested that either the public safety office or the security office of NCC be

---

[4] Plaintiff initially complained to Gai of being "harassed/stalked by a co-worker," Donna Schrimpe, in March 2001. (Compl. ¶ 30; Gai Dep. 41-42.) Gai forward plaintiff's complaint to NCC's Director of Human Resources, Fred Downs. (Compl. ¶ 30; Gai Dep. 41-42.) Defendants investigated plaintiff's allegations and, on or about June 28, 2001, advised plaintiff that their "investigation revealed that no action was warranted." (Compl. ¶ 30; Gai Dep. 43.)

provided with a copy of plaintiff's letter and react to her safety concerns in "whatever way they should." (Gai Dep. 68.) However, Gai did not "see anything" from either the public safety office or the security office "as a follow-up." (Id.) Thereafter, plaintiff filed a grievance, asserting that NCC "fails to maintain healthful working conditions" in that "her work area is too cold and unsafe." (Def. Ex. O.) This grievance was subsequently denied.[5] (Def. Ex. O.)

On August 21, 2001, plaintiff filed a complaint with the New York State Department of Human Rights ("NYSDHR"), alleging discrimination by NCC for failure to provide her with a reasonable accommodation pursuant to the ADA - removal from the night shift.[6] (Downs Dep. 85-86; Def. Ex. P.) Plaintiff again wrote to Gai concerning her work accommodations by letter dated August 23, 2001. Plaintiff thanked Gai for his efforts to assist with the air conditioning issue in the computer room but stated that "this does not change the fact that the room is cold & that the change of temperature will still adversely effect [sic] my osteo-arthritis condition, as will the constant walking, sitting/standing, lifting & carrying that takes place on the night shift." (Pl. Ex. G.) Plaintiff further reiterated her concern for her safety while working on the night shift.

---

[5] In a decision dated October 16, 2001, the grievance officer found that NCC had not violated any section of the collective bargaining agreement. (Def. Ex. O.) With respect to plaintiff's claims regarding the temperature in her office, the grievance officer credited Gai's testimony at the grievance hearing that after being notified of plaintiff's concerns, Gai "went to her area himself and took care of the problem." (Id.) The grievance officer noted that after Gai addressed the problem with plaintiff's air conditioning, plaintiff "sent Mr. Gai a letter thanking him for resolving the problem." (Id.) As to plaintiff's claims regarding her safety, the grievance officer found that plaintiff's "work area [was] equipped with an electronic door lock and a hand held panic device" and that "the office has camera surveillance and the building has a security guard." (Id.) Plaintiff's grievance was denied in its entirety. (Id.)

[6] The NYSDHR complaint was amended on August 13, 2002. (Compl. ¶ 8.) However, since neither party submitted the amendment in connection with the within motion, the Court is unaware of its content.

(Id.)

       While training for her new position in and around the first three weeks of August 2001, plaintiff utilized sick leave thirteen (13) out of fifteen (15) days. (Def. R. 56.1 ¶ 30; Pl. R. 56.1 ¶ 30; Dep. of April Cody, dated Dec. 28, 2006 ("Cody Dep. II"), 261.) Plaintiff failed to complete a single shift during the month of August and her attendance was characterized by Gai as "extremely poor." (Gai Dep. 74; Cody Dep. II 261.) Gai addressed the problem with plaintiff, who indicated that she did not want to work the night shift. (Gai Dep. 74, 77.) Plaintiff thereafter received a NOPA, dated September 4, 2001, which cited abuse of leave entitlements. (Def. R. 56.1 ¶ 31; Pl. R. 56.1 ¶ 31.) Plaintiff received a second NOPA, also dated September 4, 2001, for alleged misconduct that occurred on August 31, 2001.[7] (Def. R. 56.1 ¶ 32; Pl. R. 56.1 ¶ 32.)

       As a result of plaintiff's extensive use of sick leave, in accordance with the provisions of the Collective Bargaining Agreement in place between NCC and its employees, NCC placed plaintiff on a "Medical Review List." (Def. R. 56.1 ¶ 34; Pl. R. 56.1 ¶ 34; Gai Dep. 78-79.) A Medical Review List is a status under the civil service contract that requires an employee to provide a doctor's note whenever he or she utilizes sick leave. (Gai Dep. 78.) Fred Downs, NCC's Director of Human Resources, was responsible for making the decision to place plaintiff on the Medical Review List. (Id. at 78-79.)

       On September 17, 2001, plaintiff telephoned her supervisor, Katherine Flick, and informed her that she would be taking leave pursuant to the Family Medical Leave Act

---

     [7] The parties have not provided the Court with all of the NOPAs issued during plaintiff's term of employment. Where provided, the allegations of misconduct are described.

("FMLA"). (Def. R. 56.1 ¶ 35; Pl. R. 56.1 ¶ 35.) On September 25, 2001, plaintiff applied for, and was granted, FMLA benefits, requesting leave from September 25, 2001 through November 5, 2001. (Def. R. 56.1 ¶ 36; Pl. R. 56.1 ¶ 36; Pl. Ex. N.) Plaintiff accompanied her request for FMLA leave with a letter from her physician, Dr. Lipschutz, dated September 24, 2001, which stated that plaintiff "continues in treatment for anxiety and depression" and that her symptoms were "progressing despite active treatment." (Pl. Ex. N.) Dr. Lipschutz further stated that "[a]s a result, [plaintiff] has experienced impaired abilities to function at home as well as work" and recommended that plaintiff "take a medical leave of absence until she fully recovers." (Id.)

On September 26, 2001, while on FMLA leave, plaintiff received another NOPA, citing misconduct and insubordination for several events that took place during the month of September 2001, prior to plaintiff's FMLA leave. (Def. R. 56.1 ¶ 37; Pl. R. 56.1 ¶ 37; Pl. Ex. Q.) The NOPA stated that on September 10, 2001, plaintiff failed to "run a scheduled computer job" and that certain forms were not printed but were instead "left for the next day's shift." (Pl. Ex. Q.) The NOPA further stated that on September 12, 2001, plaintiff left work two hours early, without permission, and failed to "run several scheduled computer jobs." (Id.) In addition, the NOPA stated that on September 13, 2001, plaintiff left work one-half hour early, without permission, and "failed to run Student PELL checks for approximately 294 students totaling about $313,000." (Id.) Also on that date, plaintiff "left special forms jobs to be printed" and told her supervisor that she refused to "print any jobs that required the use of special forms on the printer." (Id.) Finally, the NOPA stated that on September 14, 2001, plaintiff: (1) left special forms to be printed; (2) left a scheduled job running on the computer when she left; (3) left the Computer Center unattended at 8:10 p.m.; and (4) used one-half day of sick leave,

resulting in "no . . . system backups" being done, "[n]o financial jobs [being] run" and "PELL checks rescheduled from the day before were again postponed." (Id.) The NOPA advised that as a result of plaintiff's misconduct and insubordination, there was "a delay in making required Financial Aid Payments to students" and "[o]ther employees were required to work [overtime], including weekends to complete [plaintiff's] work." (Id.)

Plaintiff returned from her FMLA leave on November 5, 2001. (Gai Dep. 81-82, 83, 85-86.) Upon her return to work, plaintiff was placed on the afternoon shift, from 2:00 p.m. to 9:45 p.m., (id. at 86; Cody Dep. II 295), and was required to sign in daily at the beginning of her shift on a paper time sheet and to punch out daily at the end of her shift via a time clock. (Def. R. 56.1 ¶ 39; Pl. R. 56.1 ¶ 39.) Plaintiff was not asked to work the night shift again. (Cody Dep. II 295.) Plaintiff grieved the requirement to punch out via time clock, which grievance was denied. (Def. R. 56.1 ¶ 40; Pl. R. 56.1 ¶ 40; Def. Ex. U.) On or about July 2, 2002, plaintiff and the County entered into an agreement whereby the County agreed to withdraw plaintiff from the Medical Review List. (Def. R. 56.1 ¶ 41; Pl. R. 56.1 ¶ 41.)

Thereafter, by NOPA dated September 12, 2002, plaintiff's employment with NCC was terminated. (Def. R. 56.1 ¶ 42; Pl. R. 56.1 ¶ 42; Def. Ex. W.) Dennis Gai sought plaintiff's termination for two reasons: (1) misconduct, consisting of leaving before her shift ended and falsifying time sheets on a number of occasions and (2) insubordination for refusing to punch out via time clock at the end of her shift as repeatedly directed. (Gai Dep. 98; Def. Ex. U, W.) On October 8, 2002, plaintiff filed a second complaint with the NYSDHR, alleging that by her termination, NCC was retaliating against her for filing her initial complaint of discrimination

with the NYSDHR in August 2001.[8]  (Downs Dep. 119-20; Pl. Ex. R.)  Plaintiff grieved her

termination and on November 7, 2002 a settlement was reached wherein plaintiff's employment

was reinstated, subject to a "Last Chance Agreement."  (Def. R. 56.1 ¶¶ 43-44; Pl. R. 56.1 ¶¶ 43-

44; Def. Ex. R.)  By decision of the arbitrator who oversaw plaintiff's grievance, plaintiff was

reinstated to the afternoon shift - 2:00 p.m. to 9:45 a.m.  (Gai Dep. 99.)  Plaintiff's attendance at

work did not improve following her reinstatement.  (Id. at 100.)

On or about January 8, 2003, plaintiff requested that her CSEA representative advocate

on her behalf to have her work shift changed from 2:45 p.m. to 9:45 p.m. to 12:00 p.m. to 8:00

p.m., which was not a regular shift in the Computer Center at the time.  (Def. R. 56.1 ¶ 45; Pl. R.

56.1 ¶ 45.)  Plaintiff's CSEA representative, Cynthia Smalls, made such a request to Fred Downs

by letter dated January 8, 2003.  (Pl. Ex. O.)  However, plaintiff's work shift remained the same.

(Cody Dep. II 346.)  Plaintiff verbally reiterated her request to change hours to her supervisor,

Flick, but the request was denied.  (Id.)  In or around February 2003, following an argument with

Flick, plaintiff informed Flick that she could no longer work in close proximity to her.  (Def. R.

56.1 ¶ 47; Pl. R. 56.1 ¶ 47; Cody Dep. II 346-47.)

By NOPA dated March 6, 2003, citing misconduct[9] that occurred on February 26, 2003,

plaintiff was suspended without pay for a period of six (6) days, effective February 27, 2003.

---

[8]  The October 8, 2002 NYSDHR complaint erroneously states that plaintiff filed a
previous complaint of discrimination with the NYSDHR on September 17, 2001.  (Pl. Ex. R.)
However, the record indicates that plaintiff's first NYSDHR complaint is dated August 21, 2001
and bears the NYSDHR complaint number described in plaintiff's October 8, 2002 complaint as
having been filed on September 17, 2001.  (Def. Ex. P.)  There is no indication from either party
that another NYSDHR complaint was filed by plaintiff on September 17, 2001.

[9]  See footnote 9 supra.

(Def. R. 56.1 ¶ 50; Pl. R. 56.1 ¶ 50.)  Plaintiff received a second NOPA, also dated March 6, 2003, citing insubordination and misconduct on the part of plaintiff, which fined plaintiff $100 and demoted her two (2) steps in grade.  (Def. R. 56.1 ¶ 51; Pl. R. 56.1 ¶ 51.)  Plaintiff further received a third NOPA, also dated March 6, 2003, citing misconduct and violations of the "Last Chance Agreement," which terminated plaintiff, effective March 6, 2003.  (Def. R. 56.1 ¶ 52; Pl. R. 56.1 ¶ 52.)

Plaintiff's NYSDHR complaints were cross-filed with the Equal Employment Opportunity Commission ("EEOC") and on February 16, 2005, plaintiff received a right to sue letter with reference to her NYSDHR complaints.[10]  (Compl. ¶¶ 7, 10, 12.)  Plaintiff thereafter commenced the within action.

### DISCUSSION

I.      Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden is on the moving party to establish the lack of any factual issues.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties.

---

[10]  The Court notes that the right to sue letter that plaintiff received from the EEOC was not provided to the Court in connection with the instant motion, nor is it appended to plaintiff's Complaint.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Rather, the requirement is that there be no "genuine issue of material fact."  Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).  When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts."  Id. at 586.  Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial."  Anderson, 477 U.S. at 248.

Motions for summary judgment in employment discrimination actions should be evaluated with special care.  See Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted).  Since "direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  Id. (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).  Even in the discrimination context, however, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."  Schwapp, 118 F.3d at 110 (citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

Summary judgment should not be regarded as a procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure, which are designed to "secure the just, speedy and inexpensive determination of every action."  Celotex, 477 U.S. at 327.  Rule 56 must be "construed with due regard not only for the rights of persons asserting claims and defenses

that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those persons "opposing such claims and defenses to demonstrate, . . . prior to trial, that the claims and defenses have no factual basis."  Id.  By its terms, Rule 56 does not require that a trial judge make any findings of fact.  See Anderson, 477 U.S. at 250.  The only inquiry to be performed is the determination of whether there is a need for trial.  See id.  The court's principal analysis on a motion for summary judgment is to ascertain whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id.

II.     The ADA

Pursuant to the ADA, an employer is prohibited from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Here, plaintiff is alleging that (1) she suffered a discriminatory discharge as a result of her disability and (2) defendants failed to reasonably accommodate her disability prior to her termination.

A.      Discriminatory Discharge

"A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case."  Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998) (citing Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996)).  To satisfy this burden, plaintiff must establish that (1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential

functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability.  See Ryan at 869-70 (citations omitted); Sanzo v. Uniondale Union Free Sch. Dist., 381 F. Supp. 2d 113, 117 (E.D.N.Y. 2005) (citations omitted). "The burden that such a plaintiff must meet in order to defeat summary judgment at the prima facie stage is not 'onerous,' and has been described as 'de minimus.'"  Sanzo, 381 F. Supp. 2d at 117 (quoting Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000)).

If the plaintiff is able to meet her burden of establishing a prima facie case, "the burden of production then shifts to the defendant who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination."  Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  At this stage, "[t]he employer merely needs to 'explain what he has done.'"  Sanzo, 381 F. Supp. 2d at 117-18 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  Should the employer satisfy its burden, the analysis is complete and "the presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some [non-discriminatory] response, simply drops out of the picture."  Greenway, 143 F.3d at 52 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)) (first alteration in original).  The "ultimate burden" resides with the plaintiff, who must prove that "the employer's proffered reason is merely a pretext for its intentional discrimination."  Greenway, 143 F.3d at 52 (citations omitted).  "If the plaintiff cannot prove intentional discrimination motivated by [her] disability, then the defendants are entitled to summary judgment."  Sanzo, 381 F. Supp. 2d at 118.

The first prong of a prima facie case of disability discrimination - that defendants are

subject to the ADA - is not in dispute here.

        1.        <u>Disability</u>

Under the ADA, "disability" is defined as follows:

(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

"Courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA." <u>Sussle v. Sirina Prots. Sys. Corp.</u>, 269 F. Supp. 2d 285, 296 (S.D.N.Y. 2003) (quoting <u>Stalter v. Bd. of Coop. Educ. Servs.</u>, 234 F. Supp. 2d 323, 329 (S.D.N.Y. 2002)). First, plaintiff must demonstrate that she suffers from a physical or mental impairment. <u>See</u> <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 641 (2d Cir. 1998) (citing <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631 (1998)). Second, plaintiff "must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity.'" <u>Sussle</u>, 269 F. Supp. 2d at 297 (quoting <u>Pimentel v. City of New York</u>, No. 00 Civ. 326, 2001 WL 1579553, at *11 (S.D.N.Y. Dec. 11, 2001)). Third, plaintiff must demonstrate that her impairment "substantially limit[s]" the major life activity identified in step two. <u>Colwell</u>, 158 F.3d at 641 (quoting <u>Bragdon</u>, 524 U.S. at 631).

        a.        <u>Physical or Mental Impairment</u>

Although the ADA does not define the term "impairment," the EEOC has issued administrative regulations implementing the ADA, which define a "physical or mental impairment" as follows:

(1) Any physiological disorder, or condition . . . affecting one

or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). "Under the law of this Circuit, the EEOC's regulations are entitled to 'great deference' in interpreting the ADA." Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999) (citing Reeves v. Johnson Controls v. World Servs., Inc., 140 F.3d 144, 150 n.3 (2d Cir. 1998)); see also Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) ("Because the [EEOC] is the agency that bears responsibility for implementing specific provisions of the ADA, we generally defer to the EEOC regulations in construing the ADA's terms.") (citations omitted).

Plaintiff herein alleges that she suffers from both osteoarthritis and generalized anxiety disorder, both of which have been recognized as constituting impairments under the ADA. See Reeves, 140 F.3d at 150 (recognizing panic disorders as mental impairments for purposes of the ADA); Covello v. Depository Trust Co., 212 F. Supp. 2d 109, 118 (E.D.N.Y. 2002) (stating that "arthritis . . . is a condition that affects [the] musculoskeletal system" and "[a]s such, . . . is a physical 'impairment' as that term is defined in the ADA"). Accordingly, plaintiff has satisfied the first step of the three-part test for determining whether she has an actual disability under the ADA.

      b.     Major Life Activities

"Merely having an impairment does not make one disabled for purposes of the ADA." Sussle, 269 F. Supp. 2d at 298 (quoting Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 195 (2002)). Rather, the plaintiff must also "demonstrate that the

-20-

impairment limits a major life activity." Sussle, 269 F. Supp. 2d at 298 (quoting Toyota Motor Mfg., 534 U.S. at 195). In the within action, plaintiff asserts that her osteoarthritis prevents her from being able to walk distances, bend, climb, and lift or move large or heavy objects. (Compl. ¶ 25.) As a result of her generalized anxiety disorder, plaintiff asserts that she has "difficulty working in isolated, remote or unsecured locations." (Id.)

"'Major life activities' are generally 'those activities that are of central importance to daily life.'" Sussle, 296 F. Supp. 2d at 298 (quoting Toyota Motor Mfg., 534 U.S. at 197). Such activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Colwell, 158 F.3d at 642 (quoting Bragdon, 524 U.S. at 638; see also 29 C.F.R. § 1630.2(i) (listing same). The Second Circuit has also identified other "major life activities," including, but not limited to, "sitting, standing, lifting or reaching." Ryan, 135 F.3d at 870.

As stated supra, plaintiff asserts that her osteoarthritis limits her ability to walk, bend, climb and lift or move certain objects, all of which I find to be major life activities. With respect to her generalized anxiety disorder, plaintiff appears to assert that her anxiety impairs her ability to work, which is also a recognized major life activity. Accordingly, plaintiff has satisfied the second part of the three-step inquiry for determining whether she suffers from a disability for purposes of the ADA.

        c.      Substantial Limitation

"To constitute a disability, an impairment must not merely affect a major life activity, it must 'substantially limit' that activity." Sussle, 269 F. Supp. 2d at 300 (quoting EEOC v. Walden, No. 98 Civ. 2270, 2002 WL 31011859, at *13 (S.D.N.Y. Sept. 9,

2002)).  "Thus a plaintiff who showed that [she] had an impairment and that the impairment affected a major life activity would nonetheless be ineligible [to prevail under the ADA] if the limitation of the major life activity was not substantial."  Colwell, 158 F.3d at 641; see also Ryan, 135 F.3d at 870 (noting that "in assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities").

The EEOC regulations provide that an impairment, whether physical or mental, "substantially limits" a major life activity where an individual is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

"In other words, the ADA protects only a limited class of persons - individuals who suffer from impairments significantly more severe than those encountered by ordinary people in everyday life."  Sussle, 296 F. Supp. 2d at 300 (quoting Aquinas v. Federal Express Corp., 940 F. Supp. 73, 77 (S.D.N.Y. 1996)).  As the Supreme Court has noted, the use of the word "substantially" suggests "considerable or to a large degree."  Toyota Motor Mfg., 534 U.S. at 197.  "The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of [a major life activity] from qualifying as disabilities."  Id. (citation omitted).  Accordingly, "to be substantially limited in performing [a major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing

activities that are of central importance to most people's daily lives." Id. at 198.  Moreover, "[t]he impairment's impact must also be permanent or long-term."  Id.

"[T]he determination of whether an individual is disabled under the ADA is made on an individualized, case-by-case basis."  Reeves, 140 F.3d at 151.  To prove that she suffers from a disability that substantially limits a major life activity, a plaintiff is required to "do more than 'merely submit evidence of a medical diagnosis of an impairment.'"  Covello, 212 F. Supp. 2d at 119 (quoting Toyota Motor Mfg., 534 U.S. at 198).  Rather, "the ADA requires those claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial."  Covello, 212 F. Supp. 2d at 119 (quoting Toyota Motor Mfg., 534 U.S. at 198) (internal quotation marks omitted) (alteration in original).  As a result, "a plaintiff cannot prevail on an ADA disability discrimination claim where [she] merely submits evidence that [she] suffers from [an impairment]."  Sussle, 269 F. Supp. 2d at 305.

In the within action, plaintiff has submitted several doctor's notes, from three separate doctors, stating that she suffers from osteoarthritis and generalized anxiety disorder.  (Pl. Ex. E, I, J, N.)  However, none of the doctor's notes detail how these impairments substantially limit plaintiff's ability to perform major life activities.  Rather, the doctor's notes simply state that, with respect to her osteoarthritis, plaintiff is "unable to walk distances," (Pl. Ex. E), is "unable to perform repetitive bending or climbing [and] was advised not to walk long distances."  (Pl. Ex. J.)  With respect to her generalized anxiety disorder, plaintiff's doctor's notes merely advise that plaintiff has "experienced symptoms of generalized anxiety and panic attacks at work," (Def. Ex. I), and that, as a result, "she has experienced impaired abilities to function at home as well as

work." (Def. Ex. N.)  Nothing in any of the doctor's notes submitted supports a finding that plaintiff is "unable to perform" or "significantly restricted" in her ability to perform the major life activities she has identified as being impacted - walking, climbing, bending, lifting or working.  See 29 C.F.R. § 1630.2(j)(1); see also Covello, 212 F. Supp. 2d at 120 (rejecting plaintiff's claim that her ability to walk or stand was substantially limited as a result of her arthritis where plaintiff's doctor's notes and medical records did not indicate that she was "prevented or severely restricted in performing either of these activities").  Moreover, other courts have repeatedly held that "[t]he 'inability to walk long distances or to climb stairs does not in itself substantially limit' an individual's ability to perform a major life activity."  Sussle, 269 F. Supp. 2d at 312 (quoting Stewart v. Weast, 228 F. Supp. 2d 660, 662) (D. Md. 2002)) (collecting cases).

With respect to plaintiff's claim that her generalized anxiety disorder substantially limits her ability to work, this claim fails as well.  "An individual is substantially limited in the ability to work only if [she] is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.'"  Reeves, 140 F.3d at 154 (quoting 29 C.F.R. § 1630.2(j)(3)(i)) (additional citation omitted).  "[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  Colwell, 158 F.3d at 643 (quoting 29  C.F.R. § 1630.2(j)(3)(I)).  Here, plaintiff does not allege that her generalized anxiety disorder precludes her from performing capable work in a broad range of jobs.  Nor does plaintiff even allege that her anxiety prevents her from working as a Computer Operator.  In fact, plaintiff expressly testified at her deposition that she was "always able to perform [the] functions" of her position as a Computer Operator.  (Cody Dep. 61-62.)  Rather, all that plaintiff alleges is that her

impairment prevents her from working as a Computer Operator during the night shift because of her "difficulty working in isolated, remote or unsecured locations." (Compl. ¶ 25.) Such an impairment is not substantially limiting under the test outlined above. See, e.g., Davis v. Oyster Bay-East, No. 03-CV-1372, 2006 WL 657038, at *6-7 (E.D.N.Y. Mar. 9, 2006) (holding that plaintiff's post-traumatic stress disorder prevented plaintiff from preforming, at most, a single, particular job); Dean v. Westchester County P.R.C., 309 F. Supp. 2d 587, 594-95 (S.D.N.Y. 2004) (holding that plaintiff's anxiety, depression and post-traumatic stress disorder precluded plaintiff from performing, at most, a single, particular job).

In addition, plaintiff has not offered any evidence of how her physical and mental impairments substantially limit her from performing major life activities, in terms of her own experience, as required to succeed on an ADA claim. See Toyota Motor Mfg., 534 U.S. at 198. Plaintiff did not provide an affidavit in opposition to defendant's motion for summary judgment. Although plaintiff did submit a Verified Complaint, which "is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist," Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)), "a verified complaint, like an affidavit, cannot create a genuine issue of material fact 'by the presentation of assertions that are conclusory.'" Mitchell v. Dep't of Corr., No. 05 Civ. 5792, 2008 U.S. Dist. LEXIS 24830, at *21 (S.D.N.Y. Feb. 20, 2008) (quoting Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004)). The Verified Complaint is obviously not tailored to address the issues raised by the NCC in moving for summary judgment and offers no facts to substantiate plaintiff's claim that she is substantially limited in her performance of major life activities. Rather, it simply recites that as a result of her

impairments, plaintiff is "unable to walk distances . . . lift or move large or heavy objects . . . bend or climb" and "has difficulty working in isolated, remote or unsecured locations."  (Compl. ¶ 25.)  Such conclusory allegations are insufficient to defeat a motion for summary judgment. See Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 94 (2d Cir. 2003) ("Mere conclusory allegations, speculation and conjecture will not avail a party resisting summary judgment.") (citation omitted).

Nor did plaintiff provide affidavits or deposition testimony from any of her treating physicians detailing the afflictions from which plaintiff suffers and how these conditions impact her daily life.  Moreover, plaintiff's deposition testimony, which was not submitted in its entirety by either party,[11] does not contain any evidence pertaining to how the "degree of limitation [plaintiff] suffers is substantial."  Colwell, 158 F.3d at 644.  Rather, plaintiff's deposition testimony merely recounts that she has suffered from osteoarthritis since junior high school and generalized anxiety disorder since approximately 2001.  Noticeably lacking is any detail as to how these impairments severely impact plaintiff's everyday life, other than plaintiff's testimony that sitting for "too long" would cause her to feel stiff and that she would "get up and walk around" to stretch her legs when she needed to.[12]  (Cody Dep. 172.)  Without such evidence, plaintiff cannot establish that she suffers from a disability under the ADA.  See id. at 645, 647

---

[11]  The Court further notes that the excerpts of plaintiff's deposition testimony that were submitted for the Court's review are primarily those relied on by the defendants in support of their motion.

[12]  In fact, plaintiff testified at her deposition that although she has suffered from osteoarthritis since junior high school and was excused from gym class during that time as a result, she was "active in sports outside of school" during both junior and senior high school. (Cody Dep. 43-44, 46

(reversing jury verdict in favor of plaintiffs in part because "plaintiffs failed to advance evidence sufficient to show that the limitation[s] [they] suffered with respect to a major life activity was substantial").

        d.      <u>Record of Having an Impairment</u>

        Plaintiff may qualify as disabled for purposes of the ADA without a showing of a substantial limitation of a major life activity where she can provide "a record" of an impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(2)(B).  According to the EEOC regulations:

> This part of the definition is satisfied if a record relied on
> by an employer indicates that the individual has or has had
> a substantially limiting impairment.  The impairment indicated
> in the record must be an impairment that would substantially
> limit one or more of the individual's major life activities.

29 C.F.R. § 1630.2(k).  "Records that could potentially contain this information include education, medical or employment records."  <u>Covello</u>, 212 F. Supp. 2d at 121 (citing 29 C.F.R. § 1630).  However, "[t]he record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough."  <u>Colwell</u>, 158 F.3d at 645 (citing 29 C.F.R. § 1630.2(k)).  In this respect, the fact that plaintiff was provided a handicapped parking permit does not suffice to demonstrate that plaintiff has a record of an impairment.  <u>See, e.g.</u>, <u>Howard v. Wal-Mart Stores, Inc.</u>, No. 3:05CV250, 2005 U.S. Dist. LEXIS 41233, at *6 (S.D. Ohio Nov. 1, 2005) ("The fact, however, that Plaintiff drives a car with . . . a [handicapped] sticker . . . does not reveal that he suffers from an ADA protected disability . . . ."); <u>Robinson v. Hoover Enters. LLC</u>, No. 1:03-CV-2565, 2004 U.S. Dist. LEXIS 25375, at *15 (N.D. Ga. Oct. 20, 2004) ("Certification or

diagnosis of a disability for purposes of a [handicapped] parking permit falls short of the exacting standards of qualifying as disabled under the ADA.").

Plaintiff offers no evidence to support a finding that she has a record of an impairment that substantially limits a major life activity. In fact, the only statement offered by plaintiff that even addresses this argument is contained in the affidavit of her counsel, Alan Wolin, in which he states that "Plaintiff and her treating health professionals repeatedly advised defendants of [plaintiff's] impairments and the manner in which she was restricted as a result. Plaintiff, therefore, has a record of such impairments . . . ." (Aff. of Alan E. Wolin, dated Jan. 7, 2008 ("Wolin Aff."), ¶ 14.) However, the doctor's notes to which plaintiff's counsel refers, as discussed <u>supra</u>, do not describe any impairment that involves a greater degree of limitation on major life activities than the impairments described in plaintiff's Complaint. Accordingly, any claim offered by plaintiff that she is disabled based on a record of impairment fails for the same reasons stated above with respect to plaintiff's claim of disability based on the substantial limitation of a major life activity.

       e.     <u>Regarded as Having an Impairment</u>

"The third way to prove a 'disability' within the meaning of the ADA is to prove that the plaintiff is 'regarded as' having an impairment that substantially limits one or more major life activities." <u>Colwell</u>, 158 F.3d at 646 (quoting 42 U.S.C. § 12102(2)(C)). "Whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" <u>Colwell</u>, 158 F.3d at 646 (quoting <u>Francis v. City of Meriden</u>, 129 F.3d 281, 284 (2d Cir. 1997)). "However, 'the mere fact that an employer is aware of an employee's

impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." <u>Reeves</u>, 130 F.3d at 153 (quoting <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 109 (3d Cir. 1996)). Rather, plaintiff must demonstrate that defendants "perceived [her] impairment as substantially limiting the exercise of a major life activity." <u>Reeves</u>, 130 F.3d at 153.

In the within action, plaintiff presents no evidence tending to show that defendants perceived her as having an impairment that substantially limited a major life activity. In fact, the crux of plaintiff's claim is that defendants repeatedly ignored her claims that she was disabled and refused to accommodate her by transferring her to the day shift, as requested. Accordingly, plaintiff cannot qualify as disabled under this analysis either.

Based on the foregoing, I find that plaintiff has failed to establish that she is disabled as defined under the ADA. Plaintiff's failure to demonstrate that she is disabled within the meaning of the ADA precludes her from establishing a prima facie case of disability discrimination. Accordingly, plaintiff's ADA claim for discriminatory discharge fails as a matter of law and there is no need to consider defendants' proffered legitimate non-discriminatory reasons for plaintiff's termination.

B.    <u>Failure to Provide a Reasonable Accommodation</u>

An employer may also be liable for discrimination under the ADA when it "fails to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee.'" <u>Sussle</u>, 269 F. Supp. 2d at 312 (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a prima facie case of discrimination based on an employer's failure to accommodate a disability, plaintiff must

demonstrate the following: (1) that the employer is subject to the ADA; (2) that she is "an

individual with a disability" within the meaning of the ADA; (3) that, "with or without

reasonable accommodation, [she] could perform the essential functions of the job," and (4) that

the employer "had notice of the plaintiff's disability and failed to provide such accommodation."

Sussle, 269 F. Supp. 2d at 312 (quoting Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir.

1995)) (additional citation omitted).

     Plaintiff alleges that defendants discriminated against her in violation of the ADA by

failing to provide her with her requested reasonable accommodation - namely, to be transferred

from the night shift to a day shift position.  However, for the reasons enumerated supra, plaintiff

has failed to demonstrate that she is disabled within the meaning of the ADA.[13]  Accordingly, her

failure to accommodate claim fails as a matter of law.

     Based on the foregoing, defendants' motion for summary judgment with respect to

plaintiff's ADA claims is granted.  Plaintiff's ADA claims are accordingly dismissed.


III.    Title VII - Retaliation

     Title VII prohibits employers from retaliating against employees for opposing

discriminatory employment practices:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees . . . because he has
> made a charge, testified, assisted, or participated in any manner
> in an investigation, proceeding, or hearing under this [subchapter].

---

[13]  The Court also notes that upon plaintiff's return from FMLA leave in November 2001, she was not assigned to the night shift again prior to her termination in March 2003.  (Cody Dep. II 295.)

42 U.S.C. § 2000e-3(a). "The order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973) . . . ." Sumner v. United States Postal Serv., 899 F.2d 203 (2d Cir. 1990)) (citation omitted).

To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that: (1) she engaged in a statutorily protected activity; (2) her employer was aware of this activity; (3) she suffered an adverse employment action; and (4) there is a "causal connection" between the protected activity and the adverse employment action. See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 1996) (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)); Devine v. Whelan, No. 90 Civ. 6272, 1993 U.S. Dist. LEXIS 12330, at *6 (S.D.N.Y. Sept. 1, 1993) (citation omitted). "To demonstrate an adverse employment action, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Garcia v. N.Y. City Admin. of Children's Servs., No. 03 Civ. 5271, 2007 U.S. Dist. LEXIS 71273, at *20 (S.D.N.Y. Sept. 26, 2007) (quoting Burlington N. and Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Proof of a causal connection may be established directly, such as through "evidence of retaliatory animus directed against a plaintiff by the defendant," DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (citations omitted), or indirectly through circumstantial evidence, such as "through evidence of disparate treatment of employees who engaged in similar conduct," Sumner, 899 F.2d at 209 (citation omitted), or "by showing that the protected activity was followed closely by discriminatory treatment." DiCintio, 821 F.2d at 115

(citation omitted); see also Devine, 1993 U.S. Dist. LEXIS 12330, at *6 ("Evidence of a causal link may be satisfied by evidence of circumstances which justify an inference of retaliatory motive . . . To draw an inference of retaliatory motive, the Court may consider the time which elapsed from the date of plaintiff's Title VII conduct and the employer's alleged retaliation."). "Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause . . . and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge." Sumner, 899 F.2d at 209 (citations omitted). Accordingly, "[t]he critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally . . . retaliated against the plaintiff for engaging in protected activity." Id. (citations omitted).

In the within action, plaintiff has failed to establish a prima facie case for retaliatory discrimination. Clearly, plaintiff engaged in protected activity when she filed her various complaints with the NYSDHR, which defendants were aware of, and suffered an adverse employment action when she was terminated. However, plaintiff has failed to demonstrate a causal link between the filing of her NYSDHR complaints and her termination. The evidence submitted by the parties establishes that plaintiff filed her first NYSDHR complaint on August 21, 2001. Plaintiff was not terminated for the first time until September 12, 2002, more than a year after she filed her charge with the NYSDHR. Similarly, plaintiff filed her second NYSDHR complaint on October 8, 2002 and was not terminated for the second time until March 6, 2003, approximately five months after engaging in protected activity. For the reasons that follow, I find both terminations to be too attenuated to qualify as a causal link.

"A 'substantial time lapse between an employee's protected activity and the adverse

employment action is counter-evidence of any causal connection between the two for purposes of a retaliatory action.'" Milford v. N.Y. City Bd. of Health, Nos. 02-CV-2834, 03-CV-2765, 2005 U.S. Dist. LEXIS 1131, at *24 (E.D.N.Y. Jan. 27, 2005) (quoting June v. Hamilton Sundstrand Corp., 321 F. Supp. 2d 408, 418 (D. Conn. 2004)).  The Second Circuit, however, "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

Despite this lack of a bright line rule, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001).  Accordingly, lapses in time as little as three months have been found insufficient to suggest a causal relationship, see, e.g., Lewis v. Snow, No. 01 Civ. 7785, 2003 WL 22077457, at * (S.D.N.Y. Sept. 8, 2003) (finding that "[p]laintiff fails to make a showing of protected activity which was 'followed closely by' the alleged retaliatory treatment" where there was more than a three-month lapse between them), and, as in the instant action, passages of time of five months or more have been routinely rejected for purposes of establishing causality.  See, e.g., Khan v. Abercombie & Fitch, Inc., No. 01 Civ. 6163, 2003 WL 22149527, at *9 (S.D.N.Y. Sept. 16, 2003) (finding five-month gap "too great to infer a causal connection"); Stuevecke v. New York Hosp. Med. Ctr., No. 01-CV-326, 2003 WL 22019073, at *5 (E.D.N.Y. Aug. 26, 2003) (finding that protected activity and adverse employment action "occurred more than five months apart - a

period which is too distant to permit a jury to find a causal connection between the two events based on time proximity"); Lambert v. New York State Office of Mental Health, No. 97-1347, 2000 U.S. Dist. LEXIS 5197, at *39-40 (E.D.N.Y. Apr. 24, 2000) (finding five months too long to establish retaliation for filing EEOC complaint).

It should be noted that plaintiff points to several other instances that she asserts constitute adverse employment actions, which occurred closer in time to the filing of her NYSDHR complaints and, based on which, plaintiff attempts to sustain her retaliation claim. These actions include: (1) falsely accusing plaintiff of being absent without authorization (compl. ¶ 43); (2) threatening plaintiff with future counseling notices and disciplinary actions (id.); (3) writing plaintiff up for leaving work early (id. ¶ 44); (4) placing plaintiff on a Medical Review List, which required documentation from her physician whenever she utilized a sick day (id.); (5) assigning plaintiff to the night shift after she requested not to be[14] (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J. 18); (6) issuing plaintiff a counseling notice while she was on FMLA leave in September 2001, which pertained to three separate incidents that occurred prior to her FMLA leave (id.); and (7) engaging in a "pattern of conduct against plaintiff which sought to create a hostile work environment," which includes altercations between plaintiff and her supervisor, Katherine Flick. (Compl. ¶¶ 42, 49, 51.) Such actions, however, do not constitute

---

[14] The Court declines to address this point because the evidence submitted establishes that plaintiff received notice that she would be reassigned to the night shift on July 6, 2001, effective August 6, 2001, (Def. Ex. I), and did not submit letters from her doctors advising that she not be reassigned until July 16, 2001, (Def. Ex. J), and August 7, 2001. (Def. Ex. M.) Plaintiff formally requested to be transferred from the night shift on August 15, 2001, some five weeks after she received notice of the night shift assignment and a week after this change became effective. (Def. Ex. N.)

adverse employment actions for purposes of a retaliation claim.[15]  See, e.g., Blake v. Potter, No.

03 Civ. 7733, 2007 U.S. Dist. LEXIS 72703, at *29 (S.D.N.Y. Sept. 24, 2007) (finding that

"being asked to bring in a doctor's note to substantiate a request for sick leave in compliance

with [company] policy, or being given a . . . letter of warning for failure to do so" do not

constitute adverse employment actions); Nix v. Cino, No. 02-CV-4609, 2006 U.S. Dist. LEXIS

67877, at *16 (E.D.N.Y. Sept. 21, 2006) ("Mere reprimands or threats of disciplinary action,

absent any other negative results, such as a decrease in pay, do not qualify as adverse

employment actions."); Nicastro v. Runyon, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) ("[M]any

of the actions complained of by plaintiff, such as . . . requiring documentation for sick leave, . . .

do not constitute 'adverse employment actions' and so cannot be the basis of any claim of Title

VII retaliation."); Castro v. NYC Bd. of Educ. Personnel, No. 96 Civ. 63140, 1998 WL 108004,

at *7 (S.D.N.Y. Mar. 11, 1998).

    Based on the foregoing, I find that plaintiff has failed to demonstrate a prima facie case

of retaliation under Title VII.  Accordingly, defendants' motion for summary judgment is

granted with respect to that claim and the claim is dismissed.

_____

    [15]  As the Supreme Court stated in Burlington Northern and Santa Fe Railway Co., 548
U.S. 53, 67 (2006), "[t]he antiretaliation provision [of Title VII] protects an individual not from
all retaliation, but from retaliation that produces injury or harm."  For that reason, the Court
announced that to constitute an adverse employment action, the action must be one that a
reasonable employee would find "materially adverse," such that "significant" harms may be
separated from "trivial" ones. Id. at 68.  The Court went on to state that "Title VII . . . does not
set forth 'a general civility code for the American workplace.'"  Id. (citations omitted). "An
employee's decision to report discriminatory behavior cannot immunize that employee from
those petty slights or minor annoyances that often take place at work and that all employees
experience . . . 'personality conflicts at work that generate antipathy' and 'snubbing by
supervisors and co-workers are not actionable under § 704(a).'"  Id. (quoting 1 B. Linderman &
P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)).

IV.     New York Executive Law

As a "condition precedent" to commencing a tort action against New York

municipalities, or any of their officers, agents, or employees, New York General Municipal Law

§ 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises.

Chesney v. Valley Stream Union Free Sch. Dist., No. 05 Civ. 5106, 2006 U.S. Dist. LEXIS

68137, at *25 (E.D.N.Y. Sept. 22, 2006).  "Notice of claim requirements are generally strictly

construed, and failure to comply with the requirements typically results in dismissal due to

failure to state a cause of action."  Id. at *26 (citing Hardy v. New York City Health and Hosp.

Corp., 164 F.3d 789, 793-94 (2d Cir. 1999)).

There is disagreement, however, among the New York courts as to whether the notice of

claim requirement set forth in General Municipal Law § 50-e applies to causes of action brought

for employment discrimination pursuant to New York Executive Law § 296.  On the one hand,

some courts have found that claims brought pursuant to Executive Law § 296 fall within the

purview of General Municipal Law § 50-e, see, e.g., Chesney, 2006 U.S. Dist. LEXIS 68137, at

*25 ("Where a plaintiff seeks the vindication of private rights regarding claims of employment

discrimination under New York Executive Law § 296, the notice of claim provisions apply.");

Zarate v. Nassau County Med. Ctr., 781 N.Y.S.2d 39, 40 (2d Dep't 2004) (reversing trial court's

denial of defendants' motion to dismiss plaintiff's § 296 claim and holding that the motion

"should have been granted because the plaintiff failed to serve a timely notice of claim");

Cavanaugh v. Bd. of Educ. of Huntington Union Free Sch. Dist., 745 N.Y.S.2d 433, 434 (2d

Dep't 2002) ("Where, as here, a plaintiff seeks private relief for employment discrimination in

violation of the Executive Law, the timely filing of a notice of claim is a condition precedent to

suit."), while others hold that "discrimination claims brought under Executive Law § 296 are not tort actions and are therefore not subject to Section 50-e's notice of claim requirement." Aggarwal v. New York City Health and Hosp. Corp., No. 98 Civ. 5063, 2000 U.S. Dist. LEXIS 1367, at *28 (S.D.N.Y. Feb. 10, 2000); see also Scopelliti v. Town of New Castle, 620 N.Y.S.2d 405, 406 (2d Dep't 1994) (stating that "an action brought pursuant to Executive Law § 296 is not a tort claim which falls within the notice provisions of the General Municipal Law").

Recent cases within the Eastern District of New York, however, have repeatedly held that not only are the notice requirements of Section 50-e applicable to claims brought pursuant to Section 296 of the New York Executive Law, but the broader notice requirements of New York County Law § 52 are applicable as well.[16] See, e.g., Drees v. County of Suffolk, No. 06-CV-3298, 2006 U.S. Dist. LEXIS 46618, at *43-47 (E.D.N.Y. June 27, 2007); Hennenberger v. County of Nassau, 465 F. Supp. 2d 176, 197-99 (E.D.N.Y. 2006); Feldman v. Nassau County, 349 F. Supp. 2d 528, 538-39 (E.D.N.Y. 2004). Section 52 of the New York County Law provides, in pertinent part:

> Any claim or notice of claim against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature . . . and any other claim for damages arising at law or in equity, alleged to have been caused or sustained in whole or in part or because of any misfeasance, omission of duty, negligent or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in accordance with section fifty-e of the general municipal law.

N.Y. County Law § 52.

---

[16] "State law claims brought under state law in federal court are subject to state procedural rules." Hennenberger v. County of Nassau, 465 F. Supp. 2d at 197 (citing Felder v. Casey, 487 U.S. 131, 141 (1988)).

The plain language of Section 52 clearly incorporates the notice of claim requirement contained in Section 50-e of the New York General Municipal Law and applies it to "[a]ny claim or notice of claim against a county for . . . invasion of personal or property rights, *of every name and nature*." N.Y. County Law § 52 (emphasis added); see also Hennenberger, 465 F. Supp. 2d at 198, 198 n.11 (citing cases). This notice of claim provision "covers plaintiff's claims against Nassau County and its entities," Feldman, 349 F. Supp. 2d at 539, which would include Nassau Community College, an entity that is owned and operated by the County and whose employees are considered County employees. See Belenky v. Nassau Comm'y Coll., 771 N.Y.S.2d 379, 379 (2d Dep't 2004) (noting that Nassau Community College is "owned" by Nassau County); Mead v. Nassau Comm'y Coll., 483 N.Y.S.2d 953, 954 (Sup. Ct. 1985) (stating that Nassau Community College is "a facility owned by the County of Nassau"); People v. Wendel, 455 N.Y.S.2d 322, 323 (N.Y. County Ct. 1982) (finding an employee of Nassau County Community College to be a "county employee" because he was "paid from county funds by a county check, and the budget of the college is subject to review and supervision of the Nassau County government").

Accordingly, with respect to the state law claims asserted by plaintiff pursuant to New York Executive Law Sections 296 and 297, "[t]he failure to file a notice of claim is fatal unless the action has been brought in the public interest, such as a class action brought to protect civil rights, or a court has granted leave to serve late notice." Hennenberger, 465 F. Supp. 2d at 198 (quoting Pustilnik v. Hynes, No. 99 Civ. 4087, 2000 WL 914629, at *6 (E.D.N.Y. June 27, 2000); see also Mills v. County of Monroe, 59 N.Y.2d 307, 308 (1983) (stating that, with respect to employment discrimination actions, "the failure to timely file a notice of claim shall be fatal

unless the action has been brought to vindicate a public interest or leave to serve late notice has

been granted by the court").  The within action is a private civil rights lawsuit and has not been

brought in the public interest.  Moreover, plaintiff has never sought leave to serve a late notice of

claim.[17]  As such, plaintiff's failure to file a notice of claim requires the dismissal of her state law

claims against the defendants.  See Drees, 2007 U.S. Dist. LEXIS 46618, at *47 (dismissing

plaintiff's state law claims for failure to serve a timely notice on the County); Hennenberger, 465

F. Supp. 2d at 199 (same); Feldman, 349 F. Supp. 2d at 539 (same).

　　　　Plaintiff attempts to rescue her state law claims by arguing that even if she were required

to file a notice of claim, which plaintiff contends that she was not, her complaints filed with the

NYSDHR, which defendants timely received, satisfied any such requirement because they

"contained all of the information necessary to comply with § 50-e."  (Pl. Mem. of Law in Opp'n

to Def. Mot. for Summ. J. 20).  In support of her argument, plaintiff cites two cases, Kushner v.

Valenti, 285 F. Supp. 2d 314 (E.D.N.Y. 2003) and Saranac Lake Central School Disrict. v. New

York State Division of Human Rights, 640 N.Y.S.2d 303 (3d Dep't 1996), both of which are

inapposite in that they pertain to the notice requirement contained in Section 3813 of the New

York Education Law, which applies to actions brought against a school district or board of

education.  See Bloom v. New York City Bd. of Educ., No. 00 Civ. 2728, 2003 U.S. Dist. LEXIS

5290, at *43 n.7 (S.D.N.Y. Mar. 31, 2003) ("The notice of claim requirements of Section

---

[17]  Even were plaintiff to seek such leave, this court would likely be without jurisdiction
to consider such an application.  See Hennenberger, 465 F. Supp. 2d at 199-200 (stating that
"although the Court of Appeals has not ruled on the issue, district courts in the Second Circuit
have routinely found that they lack jurisdiction to even consider such an application") (collecting
cases).

3813(1) apply to claims against a school district or board of education.").[18]  Plaintiff has failed to

offer a single case in which the court held that the filing of a complaint with the NYSDHR, or

the EEOC, satisfies the notice requirement of Section 50-e of the General Municipal Law.

In fact, similar arguments have been expressly rejected by other courts that have

considered this issue.  For example, in Wrenn v. New York City Health and Hospitals

Corporation, 104 F.R.D. 553 (S.D.N.Y. 1985), plaintiff asserted that he complied with Section

50-e's notice of claim requirement by filing a charge with the EEOC.  See id. at 557.  In

dismissing plaintiff's state law claims for failure to file a notice of claim, the court held that

because "Section 50-e contains specific provisions as to the form of the notice and manner of

service," a charge filed with the EEOC "does not satisfy the statutory requirements for such

notice."  Id. (citing cases).  Similarly, in Brown v. Massena Memorial, No. 99-CV-1729, 2000

U.S. Dist. LEXIS 4819, at *19-20 (N.D.N.Y. Apr. 7, 2000), plaintiff brought an action pursuant

to, inter alia, New York Executive Law § 296 and alleged that her EEOC filing satisfied Section

50-e's notice of claim requirement.  In rejecting plaintiff's argument and dismissing her Section

---

[18]  The Court notes that plaintiff does not attempt to argue that New York Education Law
§ 3813 is applicable to the within action.  Rather, plaintiff cites to the aforementioned cases as
examples to support her argument that administrative filings are sufficient to satisfy notice of
claim requirements.  As plaintiff correctly points out, in the cases she offers, the courts stated
that administrative filings may satisfy the notice of claim requirement contained in New York
Education Law § 3813 in certain circumstances.  See Kushner, 285 F. Supp. 2d at 316; Saranac
Lake, 640 N.Y.S.2d at 304.  However, these cases do not hold that an administrative filing
satisfies "any notice of claim requirement," as plaintiff argues in her memorandum of law in
opposition to the within motion.  (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J. 20-21.)
The holdings pertain only to the notice of claim requirement delineated in Section 3813 of the
New York Education Law, which, as stated supra, is inapplicable to the within action since it is
not brought against a school district or a board of education.  As discussed infra, several cases
addressing the issue have explicitly rejected plaintiff's argument as it pertains to General
Municipal Law § 50-e.

296 claim for failure to file a notice of claim, the court stated that plaintiff's EEOC charge could not serve as a notice of claim.  See id. at *21 (citing Baker v. County of Monroe, 47 F. Supp. 2d 371, 375 (W.D.N.Y. 1999)).  More recently, in Drees v. County of Suffolk, No. 06-CV-3298, 2007 U.S. Dist. LEXIS 46618, at *47-48 (E.D.N.Y. June 27, 2007), the plaintiff attempted to argue that the filing of a notice of claim was unnecessary because defendants had knowledge of plaintiff's claims.  In disregarding this argument, the court stated that none of the cases plaintiff offered in support "indicate that the notice of claim requirement may be waived where a defendant has otherwise received notice of plaintiff's intended claims."  Id. at *48.

Plaintiff has failed to satisfy the notice of claim requirement contained in New York General Municipal Law Section 50-e.  Accordingly, plaintiff's state law claims must be dismissed.

Based on the foregoing, defendants' motion for summary judgment with respect to plaintiff's claims brought pursuant to New York Executive Law § 296 and § 297 is granted and those claims are dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety and plaintiff's claims are hereby dismissed.  The Clerk of the Court is directed to enter judgment accordingly and to close this action.

SO ORDERED.

Dated: Central Islip, New York
         September 19, 2008


                                        /s/ E. Thomas Boyle
                                        HON. E. THOMAS BOYLE
                                        United States Magistrate Judge